### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **WILLIAM McCALLISTER,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil No. 08-351-P-S** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant** | ) | |

### REPORT AND RECOMMENDED DECISION[1]

This Social Security Disability ("SSD") and Supplemental Security Income ("SSI") appeal raises the question of whether substantial evidence supports the commissioner's determination that the plaintiff, who alleges disability stemming from respiratory problems, sleep apnea, seizure disorder, anxiety, depression, and narcolepsy, is capable of either returning to past relevant work or making an adjustment to work existing in significant numbers in the national economy. I recommend that the decision of the commissioner be vacated and the case remanded for further proceedings.

In accordance with the commissioner's sequential evaluation process, 20 C.F.R. §§ 404.1520, 416.920; *Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6 (1st Cir. 1982), the administrative law judge found, in relevant part, that the plaintiff was insured for

---

[1] This action is properly brought under 42 U.S.C. §§ 405(g) and 1383(c)(3). The commissioner has admitted that the plaintiff has exhausted his administrative remedies. The case is presented as a request for judicial review by this court pursuant to Local Rule 16.3(a)(2)(A), which requires the plaintiff to file an itemized statement of the specific errors upon which he seeks reversal of the commissioner's decision and to complete and file a fact sheet available at the Clerk's Office. Oral argument was held before me on June 19, 2009, pursuant to Local Rule 16.3(a)(2)(C), requiring the parties to set forth at oral argument their respective positions with citations to relevant statutes, regulations, case authority, and page references to the administrative record.

purposes of SSD benefits on February 22, 2003, the date that he alleges he became unable to work,[2] and remained insured through December 31, 2003, Finding 1, Record at 376; that the medical record through September 2004 established the presence of severe impairments consisting of chronic obstructive pulmonary disease, anxiety and depression, sleep apnea and narcolepsy, and a possible seizure disorder, Finding 3, *id.*; that the plaintiff's testimony regarding sleepiness, breathing problems, emotional difficulties, fatigue, and other limitations was not well supported by the medical evidence and was not credible to the extent of precluding performance of all substantial gainful activity, Finding 5, *id.*; that he retained the physical residual functional capacity ("RFC") to perform light work, in that during an eight-hour work day he could sit for at least six hours, stand/walk for at least six hours, and lift/carry up to 20 pounds occasionally and 10 pounds frequently, although he had to avoid driving, working at heights or around dangerous machinery, and exposure to noxious fumes, Finding 6, *id.*; that he retained the mental RFC to understand, remember, and carry out simple and routine job instructions and was able to relate appropriately to supervisors, co-workers, and the public in an unskilled work setting, and that there was no medical evidence that he had, or would experience, daytime sleep episodes of such frequency as to preclude employment, Finding 7, *id.*; that he could perform former work as a racetrack ticket agent, which was light, unskilled work, Finding 8, *id.*; that he also retained the physical and mental RFC to perform significant numbers of other light, unskilled jobs existing in the national economy, as identified by a vocational expert's testimony, Finding 9, *id.*; and that he, therefore, was not disabled on or before the date of expiration of his insured status or at any

---

[2] The plaintiff picked February 22, 2003, as his alleged onset date of disability because it was the day after a different administrative law judge rendered an unfavorable decision with respect to prior applications for SSD and SSI benefits that the plaintiff had filed on July 27, 2001. *See* Record at 370 n.2. That unfavorable decision was affirmed by this court. *See* Report and Recommended Decision (Docket No. 19), *McCallister v. Barnhart*, Civil No. 03-189-P-S ("*McCallister I*") (D. Me. Aug. 26, 2004); Order Accepting the Recommended Decision of the Magistrate Judge (Docket No. 20), *McCallister I* (D. Me. Sept. 24, 2004).

2

time thereafter, Finding 10, *id*. at 377.  The Appeals Council declined to review the decision, *id*. at 362-64, making it the final determination of the commissioner, 20 C.F.R. §§ 404.981; 416.1481; *Dupuis v. Secretary of Health & Human Servs.*, 869 F.2d 622, 623 (1st Cir. 1989).[3]

The standard of review of the commissioner's decision is whether the determination made is supported by substantial evidence.  42 U.S.C. §§ 405(g), 1383(c)(3); *Manso-Pizarro v. Secretary of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996).  In other words, the determination must be supported by such relevant evidence as a reasonable mind might accept as adequate to support the conclusion drawn.  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

The administrative law judge reached Step 4 of the sequential process, at which stage the claimant bears the burden of demonstrating inability to return to past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).  At this step, the commissioner must make findings of the plaintiff's RFC and the physical and mental demands of past work and determine whether the plaintiff's RFC would permit performance of that work.  20 C.F.R. §§ 404.1520(f), 416.920(f); Social Security Ruling 82-62, reprinted in *West's Social Security Reporting Service* Rulings 1975-1982 ("SSR 82-62"), at 813.

The administrative law judge also, alternatively, reached Step 5 of the sequential process, at which stage the burden of proof shifts to the commissioner to show that a claimant can perform work other than his past relevant work.  20 C.F.R. §§ 404.1520(g), 416.920(g); *Yuckert*,

---

[3] The decision of which the plaintiff complains, dated February 22, 2007, *see* Record at 377, was rendered on remand from the Appeals Council, *see id*. at 369.  In a decision dated February 22, 2005, the administrative law judge found the plaintiff capable of returning to past relevant work as a taxi dispatcher, stock clerk, and inventory taker.  *See id*. at 598.  The Appeals Council vacated that decision and remanded the case with instructions (i) to determine whether the plaintiff had past relevant work within the meaning of the regulations and, if not, proceed to step five of the sequential evaluation process in accordance with 20 C.F.R. §§ 404.1520 and 416.920, and (ii) obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the plaintiff's occupational base.  *See id*. at 599.  In the wake of the remand, the administrative law judge convened a new hearing during which he took the testimony of both the plaintiff and a vocational expert.  *See id*. at 380-454.

482 U.S. at 146 n.5; *Goodermote*, 690 F.2d at 7.  The record must contain positive evidence in support of the commissioner's findings regarding the plaintiff's residual work capacity to perform such other work.  *Rosado v. Secretary of Health & Human Servs.*, 807 F.2d 292, 294 (1st Cir. 1986).

The plaintiff asserts that the administrative law judge erred in (i) finding that he had failed to comply with treatment for his narcolepsy and that his limitations were in large part self-imposed, (ii) failing to consider whether the limitations imposed by his narcolepsy, together with other severe disorders, disabled him either permanently or for a closed period, (iii) failing to develop the record for the period after September 2004, particularly with respect to the plaintiff's narcolepsy, (iv) finding that the plaintiff's prior work as a racetrack ticket agent was past relevant work, (v) neglecting to specify in either his findings or in his hypothetical questions to the vocational expert that the plaintiff should be limited to "relatively solitary" work, and (vi) relying in part for his Step 5 finding on the plaintiff's ability to perform a job, that of ampule filler, that did not exist in substantial numbers in the regional economy.  *See* Plaintiff's Itemized Statement of Specific Errors ("Statement of Errors") (Docket No. 13) at 2-12.  For the reasons that follow, I recommend that the court find, on the basis of the first three points of error, that reversal and remand are warranted.  The final three points of error do not as a group warrant reversal and remand.

## I. Discussion

### A. Treatment of Narcolepsy

#### 1. Bases for Decision

The administrative law judge found that the plaintiff's narcolepsy and fatigue were the only conditions from which he suffered "that may have imposed, or may now impose, potentially incapacitating work-related restrictions[.]"  Record at 374.[4]  Yet he reasoned that:

1.     "[M]uch of the [plaintiff's] daytime sleepiness appeared to have been related to unsatisfactory nighttime sleep, which resulted from his failure to go to bed at a regular time and his failure to use his CPAP machine as prescribed."  *Id.*[5]  "Thus, a large part of [his] difficulties were/are self-imposed, just as his smoking obviously is detrimental to his breathing problems. See 20 CFR 404.1530, and 416.930."  *Id.*[6]

2.     The plaintiff's treating pulmonologist, Lewis Golden, M.D., stated that his narcolepsy would interfere with, but not preclude, full-time employment, and Dr. Golden was quite optimistic that new medication, to be instituted shortly thereafter, could do a much better job of managing that condition.  *See id.*  The plaintiff submitted no updated evidence indicating that he had not responded to the new narcolepsy medication.  *See id.*  No medical evidence indicated that he experienced such frequent daytime sleepiness that he was unable to work for any continuous period of at least 12 months.  *See id.*  His subjective complaints exaggerated the severity of his functional restrictions, which were not incapacitating.  *See id.*

---

[4] Narcolepsy is "[a] sleep disorder that usually appears in young adulthood, consisting of recurring episodes of sleep during the day and often disrupted nocturnal sleep[.]"  Stedman's Medical Dictionary ("Stedman's") 1182 (27th ed. 2000).
[5] "CPAP" is an abbreviation for the phrase "continuous positive airway pressure."  Stedman's at 421.
[6] The cited regulations provide, in relevant part: "In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work. . . .  If you do not follow the prescribed treatment without a good reason, we will not find you disabled[.]"  20 C.F.R. §§ 404.1530(a)-(b), 416.930(a)(b).

5

3.     Despite having been given the opportunity to do so, the plaintiff failed to submit any medical evidence whatsoever for the period subsequent to September 2004.  *See id.*  In the absence of such evidence, the administrative law judge declined to assume that the plaintiff's prior impairments continued to exist or to impose similar or greater degrees of functional limitation.  *See id.*

## 2.  Record Evidence

The record indicates that, based on the results of objective testing, Dr. Golden became suspicious as early as February 19, 2003, that the plaintiff might have narcolepsy as well as a previously diagnosed sleep disorder, sleep apnea.  *See id.* at 709.[7]  Definitive diagnosis was delayed by the plaintiff's difficulties with mouth-leaking during use of his CPAP machine and his refusal to wear a full face mask, which he found uncomfortable, during subsequent sleep testing.  *See, e.g., id.* at 718, 720, 792, 876, 899.  However, Dr. Golden was persuaded as of April 30, 2004, that "the diagnosis of narcolepsy is secure."  *Id.* at 899.

In a letter to the plaintiff's counsel dated September 8, 2004, Dr. Golden wrote, in relevant part:

> With regards to his sleep disorder, the sleep apnea part is well controlled with his cpap therapy and represents no real disability.  The big issue is that of his narcolepsy.  Unfortunately we are in the process of changing medications.  He had failed his first trial of medications [dexamphetamine] which Medicaid requires to be able to move on to the second phase.  We are just starting the new medication [Xyrem] and therefore I don't know at this moment how much better he will be from this problem.  Clearly his present level of hypersomnolence from his narcolepsy would interfere with full time employment.  However the response to the new medications [is] frequently so much better that this situation could change over the next couple of months.

*Id.* at 906-07; *see also id.* at 899.[8]

---

[7] Apnea is an "[a]bsence of breathing."  Stedman's at 111.  Sleep apnea is "central and/or peripheral [apnea] during sleep, associated with frequent awakening and often with daytime sleepiness."  *Id.* at 112.

[8] Hypersomnolence is excessive sleepiness.  Stedman's at 846, 1656 (definitions of "hyper" and "somnolence").

Dr. Golden's progress notes appear to support his opinion that the plaintiff's narcolepsy, at least as of September 2004, was such as to interfere with full-time employment, seemingly to the point of precluding it. *See, e.g., id.* at 718 (note of Dr. Golden dated May 22, 2003, stating that while the plaintiff had claimed to be compliant with his CPAP, feeling less sleepy, and taking fewer naps, his significant other reported that he was falling asleep just as frequently as he always had, even without knowing it); 876 (sleep study report dated April 21, 2004, demonstrating extreme hypersomnolence); 896 (note of Dr. Golden dated July 16, 2004, stating, based on review of the plaintiff's sleep diary following the start of a trial of dexamphetamine, "Although he has some days where he rates his alertness as good, he is taking a nap which is scheduled at noon time, and everyday he takes more naps.  At least 4 to 5 out of the 14 days he said that he was napping on and off throughout the entire rest of the day and could not stay awake.  Clearly this is inadequate.  His sleep is fragmented, as would be expected with this disease."); 900 (note of Dr. Golden dated March 24, 2004, stating, based on review of the plaintiff's sleep diary, that his "sleep hygiene is suboptimal to say the least.  His bedtimes vary from 8:30 to 1:30.  He has no good explanation for this.  Most nights he falls asleep fairly quickly, according to his diary, and will sleep for 3 to 4 hours straight.  He then will have disrupted sleep through the night, almost always waking up once or twice and being up for about an hour to 4 hours each time.  His total sleep time is almost always normal, according to this diary.  Even in the face of that he is napping every single day, sometimes multiple times during the day, sometime[s] off and on all day long.  Clearly the Provigil [medication] is providing nothing for him.  The fragmented sleep at night is perfectly consistent with narcolepsy."); 908 (note of Dr. Golden dated August 6, 2004, concluding that the plaintiff had a failed trial of

dexamphetamine at a reasonable dose, having slept three days straight in the middle of a two-week period, and that Dr. Golden planned to submit an application to prescribe Xyrem).

### 3.  Flaws in Findings

From all that appears, the administrative law judge reached the conclusion that the plaintiff's narcolepsy was not disabling solely on the basis of his own reading of the raw medical evidence, including Dr. Golden's September 8, 2004, letter and his progress notes reflecting the definitive diagnosis of, and initial failed treatment for, narcolepsy.  All RFC opinions of record by Disability Determination Services ("DDS") non-examining medical experts predated both Dr. Golden's opinion letter and his later progress notes on the subject of narcolepsy.  *See id.* at 251-58 (physical RFC assessment by Robert Hayes, D.O., dated January 10, 2002), 259-72 (Psychiatric Review Technique Form ("PRTF") completed by David R. Houston, Ph.D., dated January 11, 2002), 307-14 (physical RFC assessment by Iver C. Nielson, M.D., dated April 23, 2002), 315-28 (PRTF completed by Peter G. Allen, Ph.D., dated May 7, 2002), 329-32 (mental RFC assessment by Dr. Allen dated May 7, 2002), 738-51 (PRTF completed by Charles Rothstein, Ph.D., dated May 28, 2003), 767-80 (PRTF completed by Dr. Houston dated September 3, 2003), 852-59 (physical RFC assessment by Lawrence P. Johnson, M.D., dated September 25, 2003).

No medical expert was present at the plaintiff's hearings either before or after remand by the Appeals Council.  *See id.* at 380, 455.  In the absence of expert assistance, the administrative law judge's finding that the plaintiff's narcolepsy, in combination with his other impairments, was not disabling for any 12-month period prior to September 2004 cannot be found to be supported by substantial evidence.  Indeed, as noted above, the key raw medical evidence, that of Dr. Golden, seemingly points in the opposite direction.

What is more, as the plaintiff observes, *see* Statement of Errors at 2-5, to the extent that the administrative law judge found the plaintiff's narcolepsy non-disabling on the basis of noncompliance with prescribed treatment, *see* Record at 374, he erred.  While Dr. Golden does note that the plaintiff's sleep hygiene was suboptimal and that he was noncompliant at various times with CPAP usage, *see, e.g., id.* at 718, 900, it is not clear on the face of the record, at least to me as a layperson, that Dr. Golden implied that the plaintiff's narcolepsy symptoms would have abated but for that noncompliance.  The CPAP device was prescribed to address the separate sleep-related disorder of sleep apnea, not narcolepsy.  *See, e.g., id.* at 906.  In addition, Dr. Golden's notes indicate that even when the plaintiff obtained what should have been an adequate amount of sleep overall, he still was suffering from excessive daytime sleepiness, calling into question the role played by inadequate sleep hygiene in his overall symptomatology. *See, e.g., id.* at 900, 908.

In these circumstances, the administrative law judge should not have reached the question of noncompliance with treatment unless and until he determined that the plaintiff was in fact disabled but for such noncompliance.  *See, e.g.*, 20 C.F.R. §§ 404.1530(b), 416.930(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled[.]"); Social Security Ruling 82-59, reprinted in *West's Social Security Reporting Service* Rulings 1975-1982 ("SSR 82-59"), at 793 ("An individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the Social Security Administration (SSA) determines can be expected to restore the

individual's ability to work, cannot by virtue of such 'failure' be found to be under a disability.").[9]

As the plaintiff points out, *see* Statement of Errors at 4-5, SSR 82-59 makes clear that a claimant cannot be found non-disabled on the basis of failure to comply with prescribed treatment unless the record is sufficiently developed to permit that conclusion, *see* SSR 82-59 at 794-95, 797 (claimant should be given the opportunity to fully express his or her specific reasons for not following prescribed treatment through detailed questioning, if needed, and be made aware that continued failure to do so without good reason can result in denial of benefits; it may also be necessary to recontact the claimant's treating source to substantiate or clarify what the individual was told; "before a determination is made, the individual . . . will be informed of this fact and of its effect on eligibility for benefits.  The individual will be afforded the opportunity to undergo the prescribed treatment or to show justifiable cause for failing to do so.").  The record is not sufficiently developed with respect to the plaintiff's assertedly poor sleep hygiene, failure to comply with prescribed CPAP treatment, or apparent failure to comply with prescribed Xyrem treatment, or possibly any treatment, after September 2004.[10]

---

[9] While it is true, as counsel for the commissioner pointed out at oral argument, that an administrative law judge permissibly may draw an inference that a claimant does not suffer from incapacitating symptoms based on a failure to seek or comply with treatment, *see, e.g.*, Social Security Ruling 96-7p, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991 (Supp. 2008) ("SSR 96-7p"), at 140 ("[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."), the administrative law judge in this case both invoked 20 C.F.R. §§ 404.1530 and 416.930, which come into play only when a claimant is found to suffer from incapacitating symptoms, and acknowledged that the plaintiff may in fact have so suffered, *see* Record at 374.

[10] At his September 13, 2004, hearing, the plaintiff testified that he was not taking the newly-prescribed medication because he understood that it was contraindicated for people such as himself who had lung problems and seizure problems and that other doctors, pharmacists, and nurses had advised him not to take it.  *See* Record at 469-70.  He stated that he had an appointment to discuss the new medication with Dr. Golden.  *See id.* at 470.  At the outset of his November 8, 2006, post-remand hearing, his counsel stated that he had lost his Maine Care insurance shortly after the prior hearing and, therefore, there were no new medical records to submit.  *See id.* at 384.  Later during that hearing, the plaintiff testified that he had in fact sought some medical treatment during that interim.  *See id.* at 410.  The administrative law judge held the record open to permit submission of new records, *see id.* at 452, but none
*(continued on next page)*

Reversal and remand are warranted for purposes of making a determination whether, setting aside the issue of failure to follow prescribed treatment, at any point after February 22, 2003, the plaintiff's combination of impairments was such as to render him disabled, either on an ongoing basis or for a closed period.   To decide that question, the administrative law judge should obtain the benefit of expert medical assistance and, if necessary, recontact Dr. Golden for clarification regarding opinions expressed in his September 8, 2004, letter.   *See* Social Security Ruling 96-5p, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991 (Supp. 2008) ("SSR 96-5p"), at 127 (the duty to recontact a treating physician for clarification of the basis of a treating source's opinion on an issue reserved to the commissioner is triggered when (i) "the evidence does not support a treating source's opinion" and (ii) "the adjudicator cannot ascertain the basis of the opinion from the case record"); *see also* 20 C.F.R. § 404.1512(e), 416.912(e).

Should the administrative law judge determine that the plaintiff did in fact suffer disabling symptoms on an ongoing basis or for a closed period, he should follow the dictates of SSR 82-59, including those pertaining to record development, to determine whether disability benefits should be denied for all or some portion of that time period on the basis of the plaintiff's failure, without good cause, to follow prescribed treatment that was expected to restore his ability to work.

## B.  Remaining Points of Error

I comment briefly on the plaintiff's remaining cluster of errors attacking the administrative law judge's Step 4 finding that he could return to past relevant work as a racetrack ticket agent and Step 5 finding that he retained the RFC to perform the jobs of produce weigher,

---

were submitted, *see id.* at 369.

cafeteria attendant, apparel stock checker, retail grocery bagger, and pharmaceutical ampule filler.  *See* Record at 374-75; Statement of Errors at 9-12.  Although counsel for the commissioner conceded at oral argument that the Step 4 finding cannot withstand scrutiny, this cluster of errors does not independently justify reversal and remand.  Even assuming *arguendo* that the administrative law judge erred at Step 5 in designating the retail grocery bagger job as "light" when it was "medium," and in relying on four jobs, those of produce weigher, cafeteria attendant, apparel stock checker, and retail grocery bagger, that do not entail relatively solitary work, *see id*. at 10-11, I disagree with the plaintiff that he erred in relying on the remaining Step 5 job of ampule filler, *see id*. at 12.

The vocational expert testified that there were 13 ampule filler jobs in Maine and 2,700 nationwide.  *See* Record at 435.  To be found to exist in significant numbers in the national economy, a job must exist "in significant numbers either in the region where you live or in several other regions of the country."  20 C.F.R. §§ 404.1566(a), 416.966(a).  Even assuming *arguendo*, as the plaintiff contends, *see* Statement of Errors at 12, that 13 jobs do not constitute a significant number in the regional economy, I find no error in the administrative law judge's reliance on the figure of 2,700 existing in the national economy.

In his statement of errors, the plaintiff attacked the 2,700 figure on the basis that it was "facially unreliable" in view of the fact that the vocational expert arrived at it merely by multiplying the number of such jobs in Maine, 13, by the proportion of Maine jobs to national jobs, 210.  *See id*. at 12 n.16.  Yet the vocational expert is just that, an expert.  The plaintiff fails to explain, and I do not perceive, why her methodology necessarily is a flawed one.

At oral argument, the plaintiff's counsel added a fresh basis for his challenge to reliance on the 2,700 figure: that the vocational expert failed to make clear that the work existed in

12

several regions of the nation, as required by 20 C.F.R. §§ 404.1566(a) and 416.966(a).  This point, raised for the first time at oral argument, is deemed waived.  *See Farrin v. Barnhart,* No. 05-144-P-H, 2006 WL 549376, at *5 (D. Me. Mar. 6, 2006) (rec. dec., *aff'd* Mar. 28, 2006) ("Counsel for the plaintiff in this case and the Social Security bar generally are hereby placed on notice that in the future, issues or claims not raised in the itemized statement of errors required by this court's Local Rule 16.3(a) will be considered waived and will not be addressed by this court.") (footnote omitted).

## II.  Conclusion

For the foregoing reasons, I recommend that the decision of the commissioner be **VACATED** and the case **REMANDED** for proceedings not inconsistent herewith.

## *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 30th day of June, 2009.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge